UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PHILIP PECORA,

    Plaintiff,

v.                                        Case No: 8:15-cv-1867-T-27AEP

ADP, LLC.,

    Defendant.

_____/

## ORDER

    **BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 28),

Plaintiff's response in opposition, (Dkt. 41), and Defendant's reply. (Dkt. 44). Upon consideration,

Defendant's motion is **GRANTED** on Plaintiff's FMLA retaliation, ADA, and FCRA claims, and

**DENIED** on his FMLA interference claim.

**I.    BACKGROUND**

    Plaintiff worked in sales for Defendant. (Dkt. 28 at p. 4; Dkt. 41 at p. 1). His performance

was evaluated largely on his ability to meet quotas for new customer interactions, potential sales, and

closed sales. (Dkt. 28 at pp. 5-6). In Defendant's business, the amount of time between the first

contact with a prospective customer and the time of closing a sale can range from a week on the

short end to several months on the long end. (Galloway Deposition, Dkt. 39-13 at 28:13-22).

    From December 2013 to July 2014, Reginald Campbell was Plaintiff's direct supervisor.

(Campbell Declaration, Dkt. 28-3). Beginning in May 2014, Plaintiff's performance began to

decline, including taking several sick days and failing to make any progress towards his quotas.

(Dkt. 41 at p. 2). Plaintiff testified that he advised Campbell around this time that he was dealing

with anxiety and drinking a lot because of personal problems at home. (Plaintiff Deposition, Dkt. 29-1 at 147-148).[1] In July 2014, Dina Galloway became Plaintiff's supervisor.(Galloway Declaration, Dkt. 28-2). Plaintiff testified that he shared less information about his issues with Galloway than he had with Campbell, but informed Galloway that he was having "a ton of anxiety" about his personal issues at home that affected his ability to focus at work. (Plaintiff Deposition, Dkt. 29-1 at 151-153).

On August 28, 2014, Galloway informed Campbell that she wished to issue a written warning to Plaintiff, and Campbell agreed with Galloway's decision. (Galloway Declaration, Dkt. 28-2; Campbell Declaration, 28-3). Campbell and Galloway issued a Written Warning ("Initial Warning") to Plaintiff on August 29, 2014. (Dkt. 39-2). The Initial Warning set performance standards that Plaintiff was expected to meet to demonstrate improvement. (Dkt. 39-2). At no time during the discussion about the Initial Warning did Plaintiff indicate that he was suffering from depression, anxiety, or issues with alcohol, or indicate that he had any problems other than going through the "saddest experience" of his life at home. (Galloway Declaration, Dkt. 28-2; Campbell Declaration, Dkt. 28-3; Plaintiff Deposition, Dkt. 29-1 at 163-164). Plaintiff testified that he does not believe Defendant issued the Initial Warning because of any disability he had. (Dkt. 29-1 at 156-157).

After the Initial Warning, Plaintiff was absent from work the next two business days and told Galloway he was at the hospital because he was ill. (Dkt. 39-8). Plaintiff was then out of the office for two and a half hours during lunch on September 5, explaining to Galloway that he was having car trouble. (Dkt. 39-8). He missed a conference call on September 8. (Dkt. 39-8). He also missed mandatory training on September 9, again explaining to Galloway that he had car trouble. (Dkt. 39-

---

[1] For his part, Campbell testified that Plaintiff told him only that he was frustrated about issues with his "fiancé," and never mentioned any issues with anxiety, depression, or alcohol use. (Dkt. 39-12 at 24:7-23).

8). On September 10, he was absent from work, and Galloway could not reach him. (Dkt. 39-8).

On September 9, 2014, Galloway made the decision to issue a Final Written Warning to Plaintiff based on his conduct following the Initial Warning, (Galloway Declaration, 28-2), with his absence from mandatory training being the final "nail, so to speak." (Galloway Deposition, Dkt. 39-13 at 81:10-15). Galloway informed Campbell and Defendant's Human Resources Department about her decision by September 10, 2014. (Hopkins Declaration, Dkt. 28-1; Galloway Declaration, 28-2; Campbell Declaration, 28-3).[2] On September 11, 2014, Plaintiff submitted an electronic application for FMLA leave, and began his leave that day. (Dkt. 39-4; 39-8).[3]

He returned to work on November 3, 2014. (Dkt. 29-1 at 174). On the morning he returned, Galloway issued the Final Warning to him. (Dkt. 29-9). Galloway informed Plaintiff that "we essentially have to pick back up where we left off before you went out on leave . . . and being out on leave does not pause or halt anything from a performance standpoint. So due to this, we're going to issue the Final Written Warning." (Dkt. 39-13, at 62:2-6).

While Plaintiff's overall sales quotas remained the same, the Final Warning required him to meet 100% of his sales goals each fiscal week starting the next week, rather than each fiscal month as the Initial Warning had required. *Compare* (Dkt. 39-2) *with* (Dkt. 39-9). Plaintiff resigned after

---

[2] The only record evidence that the parties cite as to when Defendant intended to issue this Final Warning is Galloway's testimony indicating that she would have issued it "end of September-ish," around the same time Defendant planned to issue a Final Warning to another employee. (Dkt. 39-13 at 80:4-11).

[3] Plaintiff testified that he had a conversation with Galloway on the morning of September 11, 2014 about his need to take medical leave, and that he informed her through tears that he had "very serious health issues as a result of everything [he'd] been going through," he needed treatment from a professional, and his life was on the line. (Dkt. 29-1 at 195:4-24). Galloway, for her part, testifies that the first time she found out about Plaintiff's leave was through the e-mail from Defendant's leave department after Plaintiff submitted his electronic application for leave. (Dkt. 39-13 at 52). Galloway further testified that she did not know why Plaintiff was on leave, but that she heard from another employee of Defendant that Plaintiff was in a treatment facility. (Dkt. 39-13 at 55-56).

3

receiving the Final Warning.(Dkt. 28-2). He claims that he was subjected to discrimination under the Americans with Disabilities Act ("ADA") and the Florida Civil Rights Act ("FCRA"), as well as retaliation and interference under the Family Medical Leave Act ("FMLA"). (Dkt. 20).

## II.   STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is material if it may affect the outcome of the suit under governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). All facts are viewed and all reasonable inferences are drawn in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the initial burden of showing that there are no genuine disputes of material fact. *Hickson Corp. v. Northern Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories, and admissions on file to designate facts showing a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 324. The nonmoving party's evidence "cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). The Court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the

4

Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *See id.*

**III.   DISCUSSION**

   *A.   ADA and FCRA Discrimination*

   Counts III and IV of Plaintiff's Amended Complaint assert claims under the ADA and FCRA, respectively, based on Defendant's alleged discrimination against Plaintiff's disability of anxiety and depression "by terminating Plaintiff's employment with Defendant." (Dkt. 20 at ¶¶ 46, 56). Defendant moves for summary judgment on the ground that Plaintiff cannot establish a *prima facie* case of discrimination because he was not qualified to perform the essential functions of his position, he has no evidence that Defendant knew of his disability, and he voluntarily resigned after receiving the Final Warning. In a brief response, Plaintiff argues that he has presented sufficient evidence to create a genuine dispute of material fact on these issues.

   "The ADA provides that no covered employer 'shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees.'" *Knowles v. Sheriff*, 460 F. App'x 833, 834 (11th Cir. 2012) (per curiam) (quoting 42 U.S.C. § 12112(a)). ADA discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Id.* at 835 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Claims under the FRCA use the same framework as the ADA and need not be addressed separately. *Id.* A plaintiff establishes a *prima facie* case of discrimination by showing: (1) he has a disability; (2) he is qualified to perform the essential functions of the position with or without reasonable accommodation; and (3) his employer discriminated against him because of his disability. *Id.*

5

It is axiomatic that in order for there to be a causal relationship between the employer's action and the disability, the employer must have actual knowledge of the disability. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1186 (11th Cir. 2005) ("[I]t is evident that an employee cannot be fired 'because of' a disability unless the decisionmaker has *actual* knowledge of the disability."). "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA." *Morisky v. Broward Cnty.*, 80 F.3d 445, 448 (11th Cir. 1996) (per curiam) (adopting lower court's reasoning that a prospective employee's statements that "she could not read and had taken special education courses" were insufficient to put the employer "on notice of her developmental disorder"); *see also O'Keefe v. Niagara Mohawk Power Corp.*, 714 F. Supp. 622, 625-26 (N.D.N.Y. 1989) (cited in *Morisky*, 80 F.3d at 448, for the proposition that an employer did not have actual knowledge of an employee's alcoholism disability, even though the employee's supervisors knew that he had multiple DWI convictions and had to attend court-mandated alcohol rehabilitation programs).

Under the causation analysis explicated by the Eleventh Circuit, the employer's agent who makes the termination decision must have actual knowledge of the employee's disability in order for the employee to establish that the disability was a causal factor in the employer's action. *Cordoba*, 419 F.3d at 1175. Even when the employee's direct supervisor has knowledge of information indicating that an employee suffers from a disability, that information will not be imputed to the employer when the supervisor is not the one making the termination decision. *Id.* at 1174 (noting that a direct supervisor's knowledge that the plaintiff was diagnosed with a congenital heart disorder and had to occasionally leave work when suffering from an episode is not imputed to another supervisor who made the termination decision).

Defendant concedes for purposes of summary judgment that Plaintiff's statements that he suffered from anxiety, depression, and alcohol dependency must be accepted as true. Defendant instead argues that "Plaintiff has no evidence that anyone was aware that he suffered from a disability, much less that his purported disabilities were the but-for cause of the adverse employment actions." (Dkt. 28 at p. 16). Defendant's argument is well-taken under the established precedent that vague statements of physical or mental impairment are not sufficient to establish an employer's actual knowledge of a disability. *See Cordoba*, 419 F.3d at 1186; *Morisky*, 80 F.3d at 448.

It is undisputed that by September 10, 2014 at the latest, Galloway made the decision to issue the Final Warning.[4] Accordingly, Galloway's knowledge of Plaintiff's condition on September 10, 2014 determines whether his alleged disabilities of anxiety and depression were a factor in her decision.

Viewing the evidence in the light most favorable to Plaintiff, it indicates that by September 10, 2014, he had informed Galloway that he was dealing with "a ton of anxiety" because of his personal issues at home that made it difficult for him to perform his duties at work. (Dkt. 41 at p. 2). He admits that he was not as forthcoming with Galloway about his personal problems, including issues with alcohol, as he had been with his former supervisor, Campbell. Campbell was not,

---

[4] For this reason, even if Plaintiff's testimony is true that he informed Galloway on the morning of September 11, 2014 that he had very serious health issues caused by his personal problems, that he needed professional treatment, and that his life was on the line, which are facts that Galloway seems to dispute based on her testimony, *compare* (Dkt. 29-1 at 195:4-24) *with* (Dkt. 39-13 at 52), this evidence is immaterial because Defendant had already made the decision to issue the Final Warning to him. In any event, precedent from the Eleventh Circuit directs that Plaintiff's statements that he had a very serious health issue that put his life on the line, without more, are too vague to provide Defendant with actual knowledge that his medical problems constituted a statutorily-protected disability. *See Morisky*, 80 F.3d at 448; *see also O'Keefe*, 714 F. Supp. at 625-26. Finally, evidence that Galloway may have learned from another employee that Plaintiff was at a treatment facility during his leave is immaterial because she acquired this information after she already made her decision. In short, the evidence in the light most favorable to Plaintiff shows that Galloway's knowledge at the time of making her decision to issue the Final Warning to Plaintiff was that he suffered from a "ton of anxiety," and that any further information she may have acquired after September 10, 2014 was not a factor in her decision.

however, the decisionmaker who issued the Final Warning and therefore any information he knew about Plaintiff's condition is immaterial. (Galloway Declaration, Dkt. 28-2; Campbell Declaration, Dkt. 28-3).

Plaintiff's statements to Galloway about his anxiety relating to his problems at home are insufficient to establish knowledge on her part of an alleged disability when she decided to issue the Final Warning. Just as "it does not always follow that someone who is illiterate is necessarily suffering from a physical or mental impairment," it does not follow that it follows from Plaintiff's anxiety about his home life that he was suffering from a mental disability. *See Morisky*, 80 F.3d at 448. Plaintiff's evidence, therefore, fails to create a material issue of fact as to whether his claimed disability had any role in Galloway's decision, and Defendant is therefore entitled to summary judgment on Counts III and IV.[5]

### B.    FMLA

There are two claims under the FMLA: interference and retaliation. 29 U.S.C. § 2615(a); *Hurlbert v. St. Mary's Health Care Sys.*, 439 F.3d 1286, 1293 (11th Cir. 2006). A retaliation claim asserts that an employer discriminated against an employee for engaging in FMLA protected activity, while an interference claim asserts that an employer interfered with an employee's exercise of FMLA rights. *See id.* Plaintiff brings an interference claim (Count I) and a retaliation claim (Count II).

#### 1.    Retaliation

Defendant does not dispute that Plaintiff engaged in protected FMLA leave or that he suffered an adverse employment action. Rather, Defendant argues that the undisputed evidence

---

[5] Since the record evidence shows that Plaintiff is unable to establish the third essential element of a *prima facie* case of ADA and FCRA discrimination, it is not necessary to address whether Plaintiff is a qualified individual or whether Defendant's issuance of the Final Warning constituted a constructive termination of Plaintiff's employment.

shows no causal connection between Plaintiff's FMLA leave and the adverse employment action or, in the alternative, that Defendant had legitimate, non-retaliatory reasons for its action.  In arguing that his *prima facie* case of FMLA retaliation survives summary judgment, Plaintiff points only to the temporal proximity between his FMLA leave and the adverse employment action. He asserts four arguments to show that Defendant's reasons are mere pretext.

Like ADA and FCRA retaliation claims, a FMLA retaliation claim uses the *McDonnell Douglas* burden-shifting framework. *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1267-68 (11th Cir. 2008) (per curiam) (citing *McDonnell Douglas*, 411 U.S. at 792).  Under the FMLA, Plaintiff must show that (1) he engaged in an activity protected by the FMLA; (2) he suffered an adverse employment action; and (3) the employer's decision was causally related to the protected activity.  *Id.*  If Plaintiff establishes his *prima facie* case, Defendant must then present legitimate, non-retaliatory reasons for the adverse employment action.  *Id.*  If Defendant meets this burden, the burden shifts back to Plaintiff to produce evidence that will permit a reasonable factfinder to conclude that the employer's stated reasons are mere pretext for its retaliatory actions.  *Id.*

An employee's FMLA retaliation case fails when the employee fails to put forth evidence from which a reasonable factfinder could conclude that the adverse employment action is causally linked to the protected activities under the FMLA. *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006); *see also Brungart v. Bellsouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him."). While a close temporal proximity between protected activity and the adverse employment action will be sufficient to establish causation, the Eleventh Circuit has held, in the context of the FMLA "that, in a retaliation case, when an employer contemplates an adverse employment action before an

employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago*, 453 F.3d at 1308. An employer "'proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.'" *Lewis v. City of St. Petersburg*, No. 8:14-cv-2547-T-27TWG, 2015 WL 3618525, at *5 (M.D. Fla. June 9, 2015) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).[6]

Plaintiff relies only on temporal proximity to establish causation in his *prima facie* case of retaliation. His *prima facie* case therefore fails if the undisputed evidence shows that Defendant contemplated the adverse employment action prior to his FMLA leave.

### *a.*   **Prima facie** *case*

It is undisputed that it was Galloway's decision to issue the Final Warning and she made that decision no later than September 10, 2014, the day before Plaintiff informed Defendant he was taking FMLA leave. On the morning he returned from FMLA leave, Galloway carried out her previously contemplated action. There is no record evidence indicating a causal link between Plaintiff's FMLA leave and the Final Warning other than "[i]n this case, the temporal proximity could not be closer." (Dkt. 41 at p. 15). As noted, however, temporal proximity alone is insufficient when it is undisputed that the employer contemplated, and in this case decided, to take the adverse employment action prior to the employee engaging in FMLA protected activity. *See Drago*, 453 F.3d at 1308; *Farmer*, 2009 WL 2246137, at *5.

---

[6] This Court has consistently held in cases involving retaliation claims that undisputed evidence that an employer contemplated an adverse employment action before the employee engages in protected activity makes the temporal proximity between the protected activity and the adverse action, standing alone, insufficient to establish a *prima facie* case of retaliation. *Juback v. Michaels Stores, Inc.*, 143 F. Supp. 3d 1195, 1206-07 (M.D. Fla. 2015), *appeal filed*, No. 16-10331 (11th Cir. Jan. 27, 2016); *Farmer v. Bisk Educ., Inc.*, No. 8:08-cv-239-JDW-EAJ, 2009 WL 2246137, at *5 (M.D. Fla. July 27, 2009).

Plaintiff contends that there is *prima facie* evidence of retaliation because Galloway testified that she informed him on the day of his return that "'we have to pick back up where we left off before you went out on leave . . . and being out on leave does not pause or halt anything from a performance standpoint,'" and because Defendant imposed a performance improvement plan with "unattainable performance goals and [that] used his FMLA leave as a negative factor in calculating his year-to-date sales quota." (Dkt. 41 at p. 13) (quoting Dkt. 39-13 at 62:2-4).

Plaintiff's citation to Galloway's testimony, however, leaves out her very next statement: "[s]o due to this, we're going to issue the Final Written Warning." (Dkt. 39-13 at 62:5-6). Galloway's testimony, considered in the proper context, shows therefore that she was referring to the incidents prior to Plaintiff's FMLA leave which prompted her decision to issue the Final Warning, and she was explaining her position that Plaintiff's leave did not change her decision to issue the Final Warning. Galloway's testimony is further evidence that she contemplated the Final Warning before she was aware that Plaintiff was taking FMLA leave and therefore the Final Warning was unrelated to Plaintiff's FMLA leave. Notwithstanding, the Final Warning set unattainable performance goals, which presents a separate issue bearing on Plaintiff's retaliation claim.

While a performance improvement plan that is unattainable *because of* FMLA leave may raise material issues regarding FMLA interference, it does not raise material issues regarding FMLA retaliation in the absence of a causal relationship between the performance plan and FMLA leave. For example, in *Martin v. Brevard County Public Schools*, a genuine dispute of material fact existed as to whether the employer retaliated where the employer placed the employee on an existing performance plan, discovered that the employee was about to begin FMLA leave, and informed the employee before he began leave that his employment contract "would not be renewed if FMLA leave

11

prohibited [the employee] from fulfilling his improvement plan." 543 F.3d at 1264. In *Martin*, therefore, there was evidence that the employer knew of and considered the employee's upcoming FMLA leave in its decision not to renew his contract.[7]

Here, unlike *Martin*, there is no evidence suggesting that Galloway considered Plaintiff's FMLA leave either in deciding to issue the Final Warning or in setting his performance improvement plan. In the absence of any evidence that the FMLA leave was a factor in her decision, Plaintiff does not raise a genuine issue of material fact regarding causation. *See Drago*, 453 F.3d at 1308.[8]

In sum, Defendant accurately contends that "Plaintiff has presented no evidence calling into question *when* the decision to place him on final written warning was made." (Dkt. 44 at p. 7). Plaintiff himself testifies that he did not know when Defendant made the decision to issue the Final Warning. (Dkt. 29-1 at 174:20-23). Accordingly, has not established a genuine factual dispute as to whether his FMLA leave was a factor in Galloway's decision to issue the Final Warning.[9] Even if Plaintiff's evidence has created a genuine factual dispute about causation, Defendant is still entitled to summary judgment under the *McDonnell Douglas* analysis.

---

[8] Plaintiff also cites *Pereda v. Brookdale Senior Living Communities, Inc.* for the proposition that unattainable performance plans support a claim for FMLA retaliation. 666 F.3d 1269, 1271 (11th Cir. 2012). However, *Pereda* is distinguishable since the dispositive issue in the retaliation analysis was that the District Court incorrectly concluded that the employee was not entitled to FMLA benefits and, therefore, could not have been engaged in a statutorily protected activity at the time of the alleged adverse employment actions. *Id.* at 1275-76 ("Here, we need only address the first prong of FMLA's retaliation analysis."). The Eleventh Circuit did not address the employee's allegations that the employer set unattainable performance goals in its FMLA retaliation analysis, and its opinion therefore does not support Plaintiff's argument. *See id.*

[9] Because of the lack of evidence that Plaintiff's FMLA leave was a factor in Galloway's decision to issue the Final Warning, it is unnecessary to discuss his constructive discharge claim. While Plaintiff categorizes the Final Warning and the his alleged constructive discharge as distinct adverse employment actions, his argument reveals that they are essentially the same. In any event,, as discussed, that adverse employment action was not causally related to his FMLA leave because Galloway contemplated the Final Warning before she learned of his intention to take FMLA leave. Farmer, 2009 WL 2246137, at *5.

### b.    *Non-discriminatory reason and pretext*

Assuming that Plaintiff has presented sufficient evidence to create a genuine dispute of material fact regarding a *prima facie* case of FMLA retaliation, the burden shifts to Defendant to proffer evidence establishing legitimate, non-retaliatory reasons for the Final Warning. *Martin*, 543 F.3d at 1267-68 (citing *McDonnell Douglas*, 411 U.S. at 792). Defendant has met this burden.

The record includes documented incidents which occurred immediately after the Initial Warning, including: (1) Plaintiff was absent the following two business days because of a claimed illness; (2) he was absent from work for 2.5 hours due to claimed car trouble; (3) he failed to make any prospect appointments in the week following the Initial Warning; (4) he missed a scheduled conference call; (5) he missed mandatory training again because of claimed car trouble; and finally (6) he failed to show up to work and did not respond to texts or calls. (Hopkins Declaration, 28-1 at p. 5-6; Galloway Declaration, 28-2 at pp. 8-10; Dkt. 39-8). For his part, Plaintiff testified that he did not "know exactly what was considered" in Defendant's decision to issue the Final Warning, but acknowledged some of these incidents. (Dkt. 29-1 at 167-175). Regardless, Defendant's proffered reasons for the Final Warning are legitimate and nondiscriminatory.

Because Defendant articulates legitimate, non-retaliatory reasons for issuing the Final Warning, the burden shifts back to Plaintiff to show that the stated reasons are mere pretext. *Martin*, 543 F.3d at 1267-68 (citing *McDonnell Douglas*, 411 U.S. at 792). His evidence must point to "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's proffered reason." *Diaz v. Transatlantic Bank*, 367 F. App'x 93, 97 (11th Cir. 2010) (per curiam) (quoting *Brooks v. County Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)).

Plaintiff relies on four arguments he contends demonstrate pretext: (1) Galloway "concealed" the information and goals in Plaintiff's Final Warning from her supervisor and Defendant's Human Resources department; (2) Defendant issued the Final Warning and forced him to resign on the day he returned from FMLA leave; (3) Defendant did not provide Plaintiff with the standard 30 days to improve his performance after the Initial Warning; and (4) Defendant's position that it decided to issue the Final Warning on September 10, 2014, has been developed "after-the-fact." (Dkt. 41 at pp. 16-18).

First, Plaintiff's conclusory assertion that Galloway actively concealed information about the terms of the Final Warning from her supervisor and from Defendant's Human Resources Department because "she wanted to get rid of Plaintiff and knew they would not agree with her methods" lacks any factual support.[10]  Campbell testified that it was Galloway's decision to issue a warning as Plaintiff's supervisor, that she did not need his approval, and that he was comfortable giving Galloway "complete authority to write up employees like [Plaintiff]." (Dkt.39-12 at 26:9-25). And Hopkins testified that Galloway kept her in the loop leading up to her decision to issue the Final Warning, she agreed with Galloway's reasons for the Final Warning, and she advised Galloway not to take any action until Plaintiff returned from leave. (Dkt. 39-15 at 58-62).

While Plaintiff takes issue with the fact that Galloway did not share the specific terms of the Final Warning with Campbell or Hopkins, he has not demonstrated that she was obligated to share

9. In making these serious allegations against Galloway, Plaintiff takes a conclusory leap from the available evidence. Rather than testify that Galloway "concealed" anything from them, Campbell testified that he had "very little" involvement but that he wished he knew that Plaintiff did not receive the typical amount of time to improve after the Initial Warning, (Dkt. 39-12 at 33-34), and Hopkins testified that she was unaware of the performance metrics that Galloway put in the Final Warning and that it would concern her if Campbell was not involved. (Dkt. 39-15 at 82:2-21, 83:1). It is difficult to see how Plaintiff concludes that Galloway, the person who had "complete authority" to issue him the Final Warning according to Campbell, concealed anything from anyone on these facts.

14

that information with them. It follows that Plaintiff has not demonstrated a genuine factual dispute about whether Galloway's stated reasons for the Final Warning were mere pretext for her wanting to "get rid of him."[11]

Defendant's second point to show pretext is duplicative of his *prima facie* causation argument and need not be addressed at length. As discussed, temporal proximity alone is insufficient to create a genuine dispute of material fact about FMLA retaliation when the evidence shows that the employer had decided to take the adverse employment action before learning of the employee's protected FMLA leave. As for Plaintiff's contention that the Final Warning was a retaliatory, constructive termination because its performance goals were unattainable for someone returning from two months leave, it is undisputed that Galloway contemplated this before Plaintiff began his leave. That she carried out a previously contemplated action at the earliest opportunity after his return from leave is not evidence of pretext. *Drago*, 453 F.3d at 1308.

Third, Plaintiff contends that Galloway's stated reasons are pretextual because she did not provide him the standard 30 days to improve his performance following the Initial Warning.[12] The evidence indicates, however, that Defendant has no standard time for measuring improvement after

---

[11] The only evidence Plaintiff cites to explain the animus he contends Galloway had against him, other than her frustration about his conduct immediately following the Initial Warning, is her sounding "disappointed" when he called and informed her that he needed to extend his leave. (Dkt. 41 at p. 16). The conclusory, subjective assertion that Galloway wanted to "get rid of Plaintiff" based on sounding disappointed that he had to extend his leave does not create a *genuine* issue of material fact as to whether Galloway's legitimate reasons for theFinal Warning are mere pretext for FMLA retaliation.

[12] Plaintiff contends that "Galloway does not know if Plaintiff would have been issued the Final Warning had Plaintiff not gone on FMLA and met his *sales goals* outlined in his Written Warning." (Dkt. 41 at p. 6, n.14) (emphasis added). Defendant accurately points out that Plaintiff misstates Galloway's testimony. (Dkt. 44 at pp. 2-3). In response to the question of "[h]ad [Plaintiff] not gone on FMLA leave and achieved *all of the goals* outlined for him in the written warning, would he still have been issued a Final Written Warning at the end of September?," Galloway initially replied "I can't answer that." (Dkt. 39-13 at 81:20-24) (emphasis added). When asked the follow-up question of "[b]ecause you don't know right?," Galloway responded "[r]ight." (Dkt. 39-13 at 81:25, 86:1). Galloway's inability to provide an answer to the hypothetical question posed is not persuasive evidence of pretext.

an employee receives a warning. Campbell testified that "you want to see improvement over the span of three – four weeks," (Dkt. 39-12 at 30:17-24), and Galloway indicated that Defendant typically provides employees 30 days to improve, (Dkt. 39-13 at 79:11-16). That said, numerous employees testified that an employee could be escalated to the next level of discipline at any time if the circumstances warranted. (Watkins Deposition, Dkt. 32-1 at 42-43; Hopkins Deposition, Dkt. 39-15 at 34). And neither the Initial Warning and Final Warning stated that he had 30 days to improve. (Dkt. 39-2; Dkt. 39-9).[13]

Further, Galloway's stated reasons explain why she quickly decided to escalate Plaintiff to a Final Warning shortly after the Initial Warning. Rather than demonstrate immediate improvement as expected, he exhibited a further decline in performance by, among other things, missing the very next two business days following issuance of the Initial Warning, failing to make any prospect appointments, and missing other appointments or entire days of work. (Dkt. 39-8). In explaining why she decided to issue the Final Warning so soon after the Initial Warning, Galloway testified, "[w]hen you're placed on a Written Warning, it's due to the performance you have at hand. Most people don't go backwards and not showing up to work or calling out sick or missing meanings. Most go on their best behavior." (Dkt. 39-13 at 67:8-12). Plaintiff fails to identify any weaknesses, inconsistencies, or contradictions in the reasons proffered by Galloway to explain the timing of her decision to issue the Final Warning. *See Diaz,* 367 F. App'x at 97.

Fourth, Plaintiff contends that Defendants decision to issue the written warning on September 10, 2014 was made "after-the-fact." (Dkt. 41 at p. 17). Plaintiff asserts that Defendant's after-the-fact

---

[13] Plaintiff's reliance on *Morrison v. Booth* is misplaced. *Morrison* involved a plaintiff who established a genuine dispute of material fact in a race discrimination case with evidence that the employer was willing to depart from standard procedures to promote a white employee but not to promote plaintiff, who was black. *See Morrison v. Booth,* 763 F.2d 1366, 1373-74 (11th Cir. 1985).

position is shown by evidence that Defendant "could have issued the Final Warning before Plaintiff

went on FMLA leave," Galloway might have drafted the Final Warning on the morning of Plaintiff's

return from FMLA leave, the "only advice" Hopkins provided to Galloway was to continue to

monitor Plaintiff, and Galloway did not list any of the reasons for the Final Warning in the Final

Warning itself. (Dkt. 41 at pp. 17-18).

Plaintiff's first two contentions, by implication at least, suggest that since Galloway did not

draft or issue the Final Warning before he left for FMLA leave, that, in and of itself, indicates that

she did not actually decide to issue the warning before he began his leave. Plaintiff's contention is

contradicted by the undisputed evidence that Galloway made the decision to issue the Final Warning

on September 9 after, the "nail, so to speak," of Plaintiff missing mandatory training. (Dkt. 39-13

at 81:10-15).

As to Plaintiff's third point, the undisputed evidence shows that after Hopkins advised

Galloway to continue monitoring Plaintiff on September 3, Galloway advised Hopkins on September

10 of her decision to issue the Final Warning, and Hopkins agreed with that decision. (Dkt. 28-1 at

¶¶ 19-21).[14] On Plaintiff's final point on pretext, there is some testimony that other employees

believed it might have been "helpful" for Galloway to include the reasons for the Final Warning in

the warning itself, (Hopkins Deposition, Dkt. 39-15 at 74:2-15), but Defendant correctly points out

that this evidence does not demonstrate that Defendant's stated reasons are, in fact, incongruent or

inconsistent with its actions, and therefore pretext.

---

[14] While Plaintiff is correct that the record contains only Hopkins' notes up to the September 3 conversation
in which she advised Galloway to continue to monitor Plaintiff, Plaintiff's suggestion that these notes are evidence of
the "only advice [Hopkins] provided to Galloway" ignores undisputed evidence. Plaintiff fails to acknowledge the
additional conversations between Hopkins and Galloway from September 3 to September 10 regarding his absences
and other workplace problems leading to Galloway's decision to issue the Final Warning and Hopkins' agreement
with that decision. (Hopkins Declaration, Dkt. 28-1 at ¶¶ 21-22; Galloway Declaration, Dkt. 28-2 at ¶¶ 47-49;
Hopkins Deposition, Dkt. 39-15 at 58-62).

In sum, the undisputed evidence shows that Galloway contemplated and decided to issue the Final Warning before learning that Plaintiff intended to take FMLA leave, and Plaintiff cannot make a *prima facie* case that his leave was a causal factor in her decision.   And, Defendant points to numerous incidents involving Plaintiff immediately following the Initial Warning that explain its quick decision to elevate him to a Final Warning. Had Plaintiff made a *prima facie* case of FMLA retaliation, which he has not, Defendant has proffered legitimate, nondiscriminatory reasons for the Final Warning, and Plaintiff has failed to demonstrate that those reasons were pretext.   Defendant has therefore demonstrated the absence of any genuine dispute of material fact regarding Plaintiff's FMLA retaliation claim and is entitled to judgment as a matter of law on that claim.

### 2. *Interference*

Plaintiff contends that Defendant interfered with his FMLA rights either by terminating him or by failing to restore him to an equivalent position upon his return from FMLA leave.  (Dkt. 20 at ¶¶ 32- 33). An interference claim requires an employee to demonstrate only that he was entitled to an FMLA benefit, and that the employer interfered with that benefit. *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206-07 (11th Cir. 2001). The employee is not required to prove that the employer intended to deny the benefit, only that the employer's actions interfered with the benefit. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010). And the employer's motives are irrelevant. *Hurlbert*, 439 F.3d at 1293.

There are situations in which summary judgment is appropriate on a FMLA retaliation claim but not on a FMLA interference claim. This is one of those situations. "[A] plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus,'" whereas "the employer's motives are

irrelevant" to an interference claim. *Strickland*, 239 F.3d at 1207-08 (quoting *King v. Preferred Tech. Grp.*, 166 F.3d 887, 891 (7th Cir. 1999)). For example, an employee's failure to provide sufficient information to put the employer on notice that he was taking leave that qualifies for FMLA protection precludes a retaliation claim against an employer who fires him for being absent, but does not necessarily preclude an interference claim based on the firing when those absences occurred during the protected FMLA leave. *See id.*

As discussed, it is undisputed that Galloway decided to issue the Final Warning before knowing that Plaintiff was taking FMLA leave. The timing of her decision forecloses a retaliation claim, but does not foreclose Plaintiff's interference claim, if the Final Warning interfered with Plaintiff's FMLA rights. The evidence, viewed in the light most favorable to Plaintiff, shows a genuine dispute of material fact on this issue.

"An employee has the right following FMLA leave 'to be restored by the employer to the position of employment held by the employee when the leave commenced' or to an equivalent position." *Jarvela v. Crete Carrier Corp.*, 776 F.3d 822, 831 (11th Cir. 2015) (quoting 29 U.S.C. § 2614(a)(1)(A)). It has been recognized that when an employer sets performance standards for its employees, the FMLA "can require that performance standards be adjusted to avoid penalizing an employee for being absent during FMLA-protected leave." *Pagel v. TIN, Inc.*, 695 F.3d 622, 629 (7th Cir. 2012). The Eleventh Circuit utilized a similar standard in holding that an employee's inability to meet the employer's performance standards "*as a result of* his being . . . on proper FMLA leave*" created a genuine dispute of material fact regarding interference with FMLA leave. *Martin*, 543 F.3d at 1267 (emphasis added).

19

Beginning with Plaintiff's claim that Defendant interfered with his FMLA rights by terminating him when he returned from leave, this claim fails because there is no evidence that Plaintiff's FMLA leave was a factor in Galloway's decision to issue the Final Warning. Whether the Final Warning constituted a constructive termination is immaterial, however, because the undisputed evidence shows that Galloway decided to issue the warning before she knew that Plaintiff would be taking FMLA leave. "An employer can deny reinstatement if . . . it would have discharged the employee had he not been on FMLA leave." *Krutzig*, 602 F.3d at 1235; *see also Farmer*, 2009 WL 2246137, at *6 (noting that an employer's decision to terminate an employee is "wholly unrelated" to FMLA leave when it is "made prior to [a] request for leave"). Defendant is entitled to judgment on this claim.

Notwithstanding, Plaintiff's claim that Defendant interfered with his FMLA leave by denying him the right to be restored to his previous position when he returned from FMLA leave survives summary judgment. Prior to his FMLA leave, Defendant set performance standards in the Initial Warning that required him, among other things, to have "[a] minimum of 100% of quota for each month beginning Fiscal September," the following *month*. (Dkt. 39-2). Just seven business days later, Plaintiff took FMLA leave. (Dkt. 39-8). On the morning he returned, Galloway issued the Final Warning that imposed performance standards including, among other things, "[a] minimum of 100% of quota for each Fiscal Week beginning fiscal week 2 in November," the following *week*. (Dkt. 39-9).

It is undisputed that Plaintiff did not have access to his work e-mail account or to Defendant's sales software, and was not in contact with potential customers during his two month FMLA leave. (Plaintiff Deposition, Dkt. 29-1 at 176:1-19; Galloway Deposition, Dkt. 39-13 at 60:9-

14). Nevertheless, the Final Warning delivered on the day he returned from leave modified his performance standards by requiring him to hit 100% of his sales quotas beginning the next fiscal week, rather than over the fiscal month as the Initial Warning required. *Compare* (Dkt. 39-2) *with* (Dkt. 39-9).

There is evidence indicating that these heightened performance standards were unattainable *as a result of* Plaintiff's FMLA leave. That evidence includes testimony from Campbell, his former supervisor, who stated that "[i]t would be difficult" to achieve the weekly sales quotas, which started the week following Plaintiff's return, because of the fact that Plaintiff just got back from two months of FMLA leave. (Dkt. 39-12 at 37-38). here is also testimony from other employees that achievement of these quotas by the week after Plaintiff's return ranged from "very tough" to unattainable, specifically because of his FMLA leave and his inability to cultivate potential sales during his leave. (Watkins Deposition, Dkt. 32-1 at 44-45; Golden Deposition, Dkt. 39-14 at 20).

A reasonable jury could find that the more onerous performance standards in the Final Warning were essentially conditions for Plaintiff's return to employment after his FMLA leave, regardless of whether Defendant intended them to have that effect. Indeed, the Final Warning expressly provided that "further progressive discipline, up to and including termination, will occur" if "immediate and consistent improvement is not demonstrated." (Dkt. 39-9). There is, therefore, evidence creating a genuine dispute of material fact as to whether Plaintiff "was unable to complete the plan as a result of his being . . . on proper FMLA leave." *Martin*, 543 F.3d at 1267.

Although the record evidence shows that weekly quotas, instead of monthly quotas, are standard in Defendant's final warnings and that it had legitimate reasons for issuing the Final Warning, (Galloway Deposition, Dkt. 39-13 at 72; Dkt. 39-8), the reasons for the Final Warning and

its performance standards are immaterial to whether Defendant interfered with Plaintiff's FMLA rights by setting performance standards that effectively penalized him for being absent during statutorily-protected leave. *See Pagel*, 695 F.3d at 629; *see also Hurlbert*, 439 F.3d at 1293 (holding that an employer's motives are irrelevant to a FMLA interference claim). Plaintiff's interference claim is not dissimilar to that of the employee in *Martin*, in which the Eleventh Circuit held that a genuine dispute of material fact existed as to whether the employer interfered with the employee's FMLA rights by failing to adjust an existing performance improvement plan to accommodate for the employee's absence during his FMLA leave. *Martin*, 543 F.3d at 1267.

Defendant's attempts to distinguish *Martin* are unavailing. While Defendant correctly points out that the employer in *Martin* "placed the employee on an improvement plan prior to the employee" taking FMLA leave and "stated that the employee's contract would not be renewed if 'FMLA leave prohibited [the employee] from fulfilling his improvement plan,'" (Dkt. 44 at p. 8) (quoting *Martin*, 543 F.3d at 1264), Defendant also placed Plaintiff on a performance improvement plan with monthly quotas before he began his FMLA leave. (Dkt. 39-2). And Defendant modified the plan to make it more taxing by setting a weekly quota, and informing Plaintiff when he returned from FMLA leave that it expected him to comply with the plan and hit 100% of his quotas by the next week as a condition of resuming his former position. (Dkt. 39-9).

Having made the decision to issue the Final Warning and modified performance plan before Plaintiff began his FMLA leave, and implementing that decision when Plaintiff returned from leave, it was incumbent upon Defendant to ensure that the performance standards accommodated for his statutorily protected absence and did not have the effect of penalizing him for taking FMLA leave. *See Martin*, 543 F.3d at 1267; *Pagel*, 695 F.3d at 629. In light of the record evidence, there is a

genuine dispute of material fact regarding Plaintiff's FMLA interference claim against Defendant.[15]

## IV.   CONCLUSION

For the reasons discussed, Defendant's Motion for Summary Judgment is:

(1)   **GRANTED** on Plaintiff's FMLA retaliation claim (Count II); ADA discrimination claim (Count III); and FCRA discrimination claim (Count IV); and

(2)   **DENIED** on Plaintiff's FMLA interference claim (Count I).

**DONE AND ORDERED** this ___7th___ day of February, 2017.


**JAMES D. WHITTEMORE**
**United States District Judge**


Copies to: Counsel of Record

---

[15] Defendant also contends that the performance standards are not evidence of FMLA interference because Plaintiff focused on "only two performance objectives management desired him to achieve," other objectives were achievable, and "[m]anagement expected him to demonstrate immediate and consistent improvement in *overall* performance." (Dkt. 44 at pp. 4-5). However, because the Final Warning itself provides "[i]f immediate and consistent improvement is not demonstrated, then further progressive discipline, up to and including termination, will occur," and Defendant typically gives its employees the option of either attempting to meet the objectives in the final warning or resigning with two weeks' pay, (Hopkins Deposition, Dkt. 39-15 at 29-30), Defendant's evidence merely confirms the existence of disputed issues of material fact on Plaintiff's interference claim.